UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FLEET DEVELOPMENT VENTURES, LLC :
Derivatively for and in the Name of:
FREEDOM COMMUNICATIONS OF :
CONNECTICUT, INC. :
:
v. : CIV. NO. 3:06CV0570 (HBF)
:
STEPHEN BRISKER :
:
:
:
:

## RULING ON MOTION FOR SUMMARY JUDGMENT

Counterclaim-Plaintiff Olevni, LLC ("Olevni"), brings this counterclaim against Freedom Communications of Connecticut, Inc.[1] (hereinafter "Freedom"), as a putative third-party beneficiary. Olevni alleges that Freedom contractually assumed the obligations of Hartcom, Inc. ("Hartcom"), to pay Olevni's loan obligations.

Pending is Freedom's Motion for Summary Judgment arguing, first, that the Contribution Agreement by which Hartcom contributed its radio station assets to Freedom was the only agreement between Freedom and Hartcom, and second, that this Agreement expressly provides that Freedom assumed none of Hartcom's liabilities and created no third-party beneficiary rights in Olevni. For the reasons that follow, Freedom's Motion for Summary Judgment **[Doc. #119]** is **GRANTED.**

---

[1]Counterclaim-Defendant is Fleet Development Ventures, LLC, derivatively for and in the name of Freedom Communications of Connecticut, Inc.

PROCEDURAL BACKGROUND

Plaintiff Fleet Development Ventures, LLC ("Fleet"), brought a lawsuit derivatively for and in the name of Freedom against defendant Stephen Brisker, a fifty-percent shareholder and senior executive of Freedom, alleging mismanagement and misappropriation of Freedom's assets. Fleet's interest derived from its prior capital investment in Freedom.

On September 13, 2006, the Court appointed a temporary receiver for Freedom to prevent Stephen Brisker from continuing to abuse his corporate office. [Doc. #65]. On September 18, 2006, a preliminary injunction entered against Stephen Brisker to prevent him from continuing in the abuse of his corporate office. [Doc. #68].

On July 19, 2007, the Court granted Olevni's motion to intervene as a defendant as of right for the purpose of asserting counterclaims against Freedom. [Doc. #105]. Olevni then filed counterclaims alleging breach of contract or unjust enrichment in regards to debts related to radio station assets that were conveyed to Freedom. [Doc. #107]. Pending is counterclaim-defendant Freedom's Motion for Summary Judgment. [Doc. #119].

STANDARD OF LAW

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of

law. See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, (1986). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. See D'Amico, 132 F.3d at 149. Instead, the non-moving party must produce specific, particularized facts indicating that a genuine factual issue exists. See Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998). To defeat summary judgment, "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. If the evidence produced by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. See id. at 249-50.

Pursuant to D. Conn. L. Civ. R. 56(a)(3),

> Each statement of material fact in a Local Rule 56(a)1 Statement by a movant or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and 2 Statements in conformity with Fed. R. Civ. P. 56(e). Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and, when the opponent fails to comply, an order granting the motion.

A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). "The nonmovant, plaintiff, must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in her favor." Page v. Connecticut Department of Public Safety, 185 F. Supp. 2d 149, 152 (D. Conn. 2002) (citations and internal quotation marks omitted).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the plaintiff fails to provide any proof of a necessary element of the plaintiff's case, then there can be no genuine issue as to any material fact. Id. A complete failure to

provide proof of an essential element renders all other facts immaterial. Id.; see also Goenaga, 51 F.3d at 18 (movant's burden is satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

FACTS

Based on Freedom's Local 56(a)(1) Statement [doc. #121] and exhibits[2] and Olevni's Local 56(a)2 Statement [doc. #130] and exhibits[3], the following facts are undisputed.

The Asset

1.   In 2003, Richard Weaver-Bey[4] partnered with Stephen Brisker
      to form Freedom Communications of Connecticut, Inc.
      ("Freedom") to acquire and operate radio stations. Weaver-
      Bey and Brisker each hold fifty percent (50%) of its voting
      common stock. [Doc. #121, Countercl.-Def. Local 56(a)(1)
      (hereinafter "Doc. #121") Stat. ¶ 1; Doc. #130, Countercl.-

---

[2]Freedom's 56(a)(1) exhibits include Affidavit of Receiver W. Lawrence Patrick [doc. #122], attaching exhibit "Closing Binder" dated March 31, 2004, which includes Preferred Stock Purchase Agreement (Tab 1) and Contribution Agreement (Tab 5); and Affidavit of Attorney Michael D. Blanchard [doc. #122], attaching full Deposition Transcript of Richard Weaver-Bey, dated October 9, 2007, filed in support of motion for summary judgment.

[3]Olevni's 56(a)(2) exhibits include Affidavits of Richard Weaver-Bey, dated January 22, 2008, April 12, 2006 [Doc. #12], and September 12, 2006 [Doc. #64], and Affidavit of Alan Neigher (Ex. C) filed in opposition to Freedom's motion for summary judgment. Alan Neigher is a shareholder in Olevni and former shareholder in Hartcom.

[4]Richard Weaver-Bey passed away on May 17, 2008. Jeffrey B. Cohen, Civic Leader Weaver-Bey Dies, HARTFORD COURANT, May 20, 2008, at B11. For the purposes of this ruling, the Court will refer to him in the present tense consistent with the parties' documents.

Pl. Local 56(a)(2) (hereinafter "Doc. #130") Stat. ¶ 1].

2.   Prior to forming Freedom, Weaver-Bey was a partial owner and director of Hartcom, Inc. ("Hartcom") which owned and operated a radio station known as WKND-AM. [Doc. #121 Stat. ¶ 2; Doc. #130 Stat. ¶ 2].

3.   Weaver-Bey and Brisker intended that WKND would be contributed to Freedom, that Freedom would obtain start-up capital, and that Freedom would purchase more radio stations with that capital. [Doc. #121 Stat. ¶ 3; Doc. #130 Stat. ¶ 3].

The Olevni Loan

4.   Olevni, LLC ("Olevni") is a Connecticut limited liability company, of which Weaver-Bey is a member, formed for the purpose of assuming Hartcom's loan obligations. [Doc. #121 Stat. ¶ 4; Doc. #130 Stat. ¶ 4].

5.   In 2000, Olevni became indebted for $350,000 (the "Olevni Loan"), the proceeds of which were used to discharge a Hartcom obligation in the same amount. [Doc. #121 Stat. ¶ 5; Doc. #130 Stat. ¶ 5].

6.   Olevni made payments on the Olevni Loan prior to March 2004. [Doc. #121 Stat. ¶ 6; Doc. #130 Stat. ¶ 6].

Weaver-Bey's Assumption of Hartcom Liabilities

7.   On March 28, 2004, pursuant to a "Resolution of the Board of Directors of Hartcom, Inc.," Weaver-Bey agreed to assume personally all liabilities of Hartcom as well as Olevni's obligations on the Olevni Loan:

> WHEREAS, Richard Weaver-Bey has agreed to
> assume all past, present and future liability
> of Hartcom, Inc., including repayment of the
> Connecticut Development Authority loan and
> the obligations of OLEVNI, LLC pursuant to a
> Memorandum of Understanding dated April 18,
> 2000;

(hereinafter "Weaver-Bey Assumption Resolution"). [Doc. #121 Stat. ¶ 7; Doc. #130 Stat. ¶ 7].

8.   On the same date, March 28, 2004, in exchange for Weaver-Bey's assumption of Hartcom's liabilities, the above the shareholders of Hartcom entered into a resolution transferring all shares of Hartcom to Weaver-Bey (the "Hartcom Buy-Out Resolution"). Pursuant to the Hartcom Buy-Out Resolution, the shareholders acknowledged that Weaver-Bey had assumed "all past, present and future liability of Hartcom, Inc., including . . . the obligations of OLEVNI, LLC," and "in consideration of the foregoing, the shareholders have agreed to authorize Richard Weaver-Bey to sell, transfer and convey all of the assets of Hartcom, Inc." The shareholders also indicated that they wished to sell their shares in Hartcom to Weaver-Bey, and Weaver-Bey "has agreed to indemnify each of the sellers from any and all liability for the payment of the foregoing indebtedness . . . " (i.e. including the Olevni Loan).[5] [Doc. #121 Stat. ¶ 8; Doc. #130 Stat. ¶ 8].

_____

[5]Both movant and opposing party state that these agreements transferring Hartcom shares and liability to Weaver-Bey were for the ultimate purpose of transferring the Hartcom assets to Freedom. [Doc #120. at 3; Doc. #129 at 6].

The Closing Documents: Hartcom Contribution and Fleet Investment

9.   Following negotiations between Fleet Development Ventures,
     LLC ("Fleet"), and Freedom, and pursuant to several
     interrelated agreements, Fleet agreed to invest $3.5 million
     in Freedom (the "Fleet Investment"). The agreements were as
     follows: (i) under a contribution agreement among Fleet,
     Freedom, Weaver-Bey, Brisker, and Hartcom (the "Hartcom
     Contribution Agreement"), Weaver-Bey contributed certain of
     the assets of Hartcom (the FCC license for WKND) to Freedom,
     and (ii) Fleet agreed to purchase Series A Preferred Stock
     from Freedom (the "Stock Purchase Agreement"). Quoting the
     Hartcom Contribution Agreement, "[a]s a condition precedent
     to Fleet's obligation to consummate the transactions
     contemplated by the Stock Purchase Agreement . . . the
     Senior Executives [Weaver-Bey and Brisker] have agreed to
     cause the Station Owner [Hartcom] to transfer all of its
     assets . . . to the Company [Freedom]. . . ." [Doc. #121
     Stat. ¶ 9; Doc. #130 Stat. ¶ 9].

10.  Both of these agreements, as well as several other
     agreements concurrently entered into as part of the Fleet
     Investment, together comprised the "Closing Documents."
     [Doc. #121 Stat. ¶ 10; Doc. #130 Stat. ¶ 10].

11.  There is no provision in the Closing Documents by which
     Freedom agreed to assume any of Weaver-Bey's, Olevni's, or
     Hartcom's liabilities. [Doc. #121 Stat. ¶ 11; Doc. #130
     Stat. ¶ 11].

12. The Closing Documents included a Certificate from Hartcom
    signed by Mr. Weaver-Bey, attaching the Weaver-Bey
    Assumption Resolution, see supra ¶ 7. The Closing Documents,
    section 2.1(c), also included the Hartcom Contribution
    Agreement, see supra ¶ 9, which stated:

    > [T]he transfer of the Contributed Assets
    > [WKND included] pursuant to this Agreement
    > (i) shall not include the assumption of
    > any liability related to the Contributed Assets
    > unless the Company expressly assumes any such
    > liability pursuant to Section 2.1(f).

    [Doc. #121 Stat. ¶ 12; Patrick Aff. Ex. A at tab 5, p. 5;
    Doc. #130 Stat. ¶ 12].

13. The Closing Documents, section 2.1(f), further provided:

    > Except for the Assumed Liabilities which the
    > Company [Freedom] hereby assumes and agrees
    > to discharge and perform, the Company
    > [Freedom] shall assume no liabilities or
    > obligations relating to the Contributed
    > Assets.

    "Assumed Liabilities" is defined as certain obligations
    arising after certain license and non-license closing dates,
    and are referenced in sections 3.1 and 3.2 of the Hartcom
    Contribution Agreement, neither of which references the
    Olevni Loan Obligation. [Doc. #121 Stat. ¶ 13; Patrick Aff.
    Ex. A at tab 5, pp. 2,7; Doc. #130 Stat. ¶ 13].

14. The Hartcom Contribution agreement also stated:

    > The Station Owner [Hartcom] shall assign,
    > transfer, convey, and deliver to the Company
    > [Freedom] free and clear of all Encumbrances
    > (other than Encumbrances listed on Schedule
    > 2.1(a)). . . . .

    [Doc. #121 Stat. ¶ 14; Patrick Aff. Ex. A at tab 5, p. 5;

Doc. #130 Stat. ¶ 14].

Schedule 2.1(a), titled "Permitted Encumbrances," lists such encumbrances as "None." [Doc. #121 Stat. ¶ 15; Patrick Aff. Ex. A at tab 5, sched. 2.1(a); Doc. #130 Stat. ¶ 15].

15. The Hartcom Contribution Agreement further provided:

> This Agreement contains the entire
> understanding of the parties . . . . [and]
> shall not be amended, modified or
> supplemented except by a written instrument .
> . . .

[Doc. #121 Stat. ¶ 15; Patrick Aff. Ex. A at tab 5, p. 18; Doc. #130 Stat. ¶ 15].

16. In the Closing Documents, specifically in section 5.7 of the Preferred Stock Purchase Agreement, see supra ¶ 9, Freedom represented,

> Except as contemplated by the Acquisition
> Agreement, the Company [Freedom] will have
> (after the Closing and consummation of the
> acquisitions of the Stations [defined to
> include WKND]) no Indebtedness.

[Doc. #121 Stat. ¶ 16; Patrick Aff. Ex. A at tab 1, p. 7; Doc. #130 Stat. ¶ 16].

17. The Hartcom Contribution Agreement also provided:

> Nothing in this Agreement, expressed or
> implied, is intended or shall be construed to
> confer upon any Person other than the parties
> and their successors and permitted assigns any right, remedy or cl

[Doc. #121 Stat. ¶ 17; Patrick Aff. Ex. A at tab 5, p. 18; Doc. #130 Stat. ¶ 17].

The Court granted plaintiff's Motion for Appointment of Receiver/Custodian on September 12, 2006. [Doc. #65]. Based on the credible testimony, the exhibits, and the entire record

developed during evidentiary hearings on August 28 and 29, 2006, the Court made the following findings in that ruling, to which defendant filed no objection:

18.  Plaintiff's highly qualified forensic accountant, Alan R. Mandell, CPA, CFE, DABFA, provided credible and uncontroverted testimony regarding Freedom's finances. [Doc. #65 ¶ 15].

19.  During the 2002-2004 period, Mandell found that "funds totaling nearly $92,000 appear to have been paid for Hartcom's liabilities." [Doc. #65 ¶ 35].

20.  Mandell's report states, "[a]ccording to the Assignment and Transfer Agreement between Freedom and Hartcom, only certain assets were contributed to the new organization. According to a resolution of the board of directors of Hartcom, Inc. dated March 28, 2004, Richard Weaver-Bey agreed to assume all past, present, and future liabilities of Hartcom, Inc." [Doc. #65 ¶ 36].

21.  Mandell cited the payment of Hartcom's liabilities as another example of corporate mismanagement of Freedom. [Doc. #65 ¶ 37].

<u>DISCUSSION</u>

<u>Breach of Contract</u>

Counterclaim-Defendant Freedom first argues that the written Closing Documents[6] of March 31, 2004, by which Hartcom contributed its radio station assets to Freedom was the only contract between Freedom and Hartcom, and second, that this Agreement expressly provides that Freedom assumed none of Hartcom's liabilities and created no third-party beneficiary rights in counterclaim-plaintiff Olevni.

A.   <u>The Controlling Agreement</u>

  1.   <u>Alleged Prior Agreement</u>

Olevni alleges in its complaint, "Shortly after the March 2004 transaction,[7] Hartcom, acting through Weaver-Bey, conveyed the Radio Station Assets to Freedom, in consideration of which Freedom agreed to assume Weaver-Bey's obligations to Olevni specified in Paragraph 11 herein." [Doc. #107 at ¶ 12]. Specifically, those obligations were to "(1) make the remaining payments due on the Olevni Loan and (2) reimburse Olevni for all prior payments of principal and interest that had been made on the Olevni Loan from the date of its inception." [<u>Id.</u> at ¶ 11].

---

[6]The full title of these documents was "Contribution Agreement Among Fleet Development Ventures LLC and Freedom Communications of Connecticut, Inc. and Senior Executives and Hartcom, Inc.  March 31 2004." Patrick Aff. Ex. A. p. 1. The Senior Executives were Stephen Brisker and Richard Weaver-Bey. <u>See</u> Findings of Fact ¶ 1.

[7]This refers to the "Weaver-Bey Assumption Resolution" and "Hartcom Buy-Out Resolution" of March 28, 2004. <u>See</u> Findings of Fact ¶¶ 7-8.

Olevni repeatedly alleges that this asset transfer was a separate agreement, made sometime between Weaver-Bey's buy-out of other Hartcom shareholders of March 28, 2004 and the formal Closing with Fleet of March 31, 2004. See e.g. [Doc. #129 at 7, 10, 14-16]; [Doc. #138-2 at 3 ("Freedom cannot use the parol evidence rule (as it relates to the subsequent [Closing Documents]) to exclude evidence of a prior, valid third party beneficiary contract between Olevni, Freedom, and Hartcom.")(emphasis added)]. Freedom answers that the assets were not transferred from Hartcom to Freedom until March 31, 2004, as part of the Closing Documents, and denies that there is any evidence that Freedom assumed the obligations alleged in Olevni's complaint. [Doc. #110 at ¶ 12].

As the non-moving party, Olevni must produce specific, particularized facts indicating that a genuine factual issue exists. See Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998). Olevni relies upon deposition testimony and an affidavit by Weaver-Bey to allege a prior agreement between Hartcom and Freedom to assume Weaver-Bey's obligations to Olevni. Specifically, the deposition states:

> Q.   [L]ook at paragraph 12 of Exhibit 1 [the counterclaim of intervenor Olevni]. It reads, "Shortly after the March 2004 transaction[8], Hartcom, acting through Weaver-Bey, conveyed the radio station assets to Freedom. In consideration of which, Freedom agreed to assume Weaver-Bey's obligations to Olevni, specified in paragraph 11 herein." Have I read

---

[8]See note 7 supra.

```
                    that correctly?
          A.    Yes, you did.
          Q.    Do you recall that event described in
                paragraph 12 ever occurring?
          A.    Yes, it did.
          Q.    Do you recall when it occurred?
          A.    It was either the end of March or the
                beginning of April when the transaction
                was concluded with Fleet Development
                Ventures.
          Q.    Are you saying that this agreement
                that's described in paragraph 12 of
                Exhibit 1 is part of the same agreement
                whereby Fleet purchased its preferred
                shared position, equity position in
                Freedom?
                    [Objection to the form] . . .
          A.    That was my understanding, yes.
```

[Weaver-Bey Dep. at 34:8-35:4; Doc. #130] The deposition

continues:

```
          Q.    We talked before about the agreement by
                which Fleet purchased shares in Freedom.
                That was an agreement pursuant to
                written documents you signed, right?
          A.    That's correct.
          Q.    The agreement that's described in
                paragraph 12, do you recall if that was
                part of the same written documentation?
                    [Objection to the form] . . .
          A.    It was my understanding that, that was
                part of the entire transaction.
          Q.    The transaction by which Fleet purchased stock in
                Freedom?
          A.    That's correct.
          Q.    So it wasn't a side deal made between
                Freedom and yourself.
                    [Objection to the form] . . .
          A.    No, it was not a side deal. It was --
                everything was done at the closing table
                between Fleet Development Ventures and
                Freedom Communications, which involved
                the three radio stations, the assets,
                and the licenses of the three radio
                stations.
```

[Weaver-Bey Dep. at 35:13-36:12; Doc. #130]. Finally, Weaver-Bey

testified:

```
Q.    So the closing in Washington, that
      concerned Fleet's purchase of equity in
      Freedom; correct?
A.    That's correct.
Q.    My question is: The agreement reflected
      by paragraph 12 of Exhibit 1, to the
      best of your knowledge, was that part of
      that same written agreement by which
      Fleet purchased the shared in Freedom?
A.    To the best of my knowledge, yes.
```

[Weaver-Bey Dep. at 41:2-9].

To clarify the nature of the exchange described in paragraph

12, Olevni submitted Weaver-Bey's affidavit[9], which states in

part:

```
9.    Shortly after the March 2004 transaction, Hartcom,
      acting through me, conveyed the Radio Station
      Assets to Freedom in consideration for which
      Freedom agreed to assume my obligations to Olevni
      . . . . Mr. Brisker and I, as the only owners and
      officers of Freedom, specifically discussed the
      transfer of assets from Hartcom to Freedom in
      exchange for Freedom assuming the aforesaid
      liability . . ., among others. Otherwise, there
      would have been no reason for Hartcom to transfer
      the assets to Freedom.[10]
      . . . .
11.   Prior to conveying the Radio Station
      Assets to Freedom, I discussed the
      proposed transfer with Brisker who
      agreed to the terms of the transfer as
      outlined above and authorized me to make
      such a transfer.
```

---

[9]The parties dispute whether the Weaver-Bey affidavit is
admissible, given Freedom's contention that the affidavit
contradicts the Weaver-Bey deposition. See e.g. Bank Brussels
Lambert v. Credit Lyonnais (Suisse), Nos. 93CIV6876LMM,
94CIV2713LMM, 2000 WL 1694323 at *1 (S.D.N.Y. Nov. 13, 2000). The
Court does not reach this question because it finds that the two
documents are not contradictory.

[10]Freedom counters with Weaver-Bey's testimony that WKND was
not meeting its operating costs at the time of the transfer, see
[Weaver-Bey Dep. at 22], arguing that for Freedom to assume
operation of WKND was in itself a consideration to Hartcom. [Doc.
#137 at 12 n. 15].

> 12. At about the same time, Fleet invested
>     funds into Freedom to enable Freedom to
>     purchase additional Radio Station
>     Assets. Mr. Brisker and I traveled to a
>     law firm in Washington, D.C. to sign
>     documents relating to the capital
>     infusion and to transfer Hartcom's
>     assets to Freedom. . . . It had been my
>     understanding that the agreement between
>     me and Freedom by which Freedom agreed
>     to assume the Olevni Loan would be
>     incorporated into the capital infusion
>     documentation. I have since learned that
>     such information was not contained in
>     the documents, although Freedom had
>     absolutely agreed to assume said
>     obligation, among others, in exchange
>     for receiving Hartcom's assets.

[Weaver-Bey Aff. ¶¶ 9, 11-12].

Olevni argues that Weaver-Bey's affidavit raises a genuine issue of material fact as to whether Freedom assumed the Olevni Loan in conversations with Hartcom prior to the Closing Documents.[11] However, a party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). The only evidence provided to support the allegation of a prior oral contract are statements made after the fact by Weaver-Bey, which in themselves cannot be construed to establish

---

[11]A conversation between Brisker and Weaver-Bey at that time can be characterized as a negotiation between Freedom and Hartcom because no one else held shares in either company.

a genuine dispute.

While Weaver-Bey attests to reaching an oral understanding of intent between Freedom and Hartcom, he further asserts that all transactions between the parties were memorialized in a contract in the Closing Documents.

> [W]hen the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing.

Schilberg Integrated Metals Corp. v. Continental Gas Co., 263 Conn. 245, 277 (2003)(regarding the parol evidence rule). Throughout his deposition and affidavit, Weaver-Bey repeatedly discredits the allegation of a prior agreement by insisting that "everything was done at the closing table between Fleet Development Ventures and Freedom Communications, which involved the three radio stations, the assets, and the licenses of three radio stations." [Weaver-Bey Dep. at 36:8-12]. See also [Weaver-Bey Dep. at 34:23-35:4, 35:18-24, 41:5-9; Weaver-Bey Aff. ¶ 12 ("I traveled to a law firm in Washington, D.C. . . . to transfer Hartcom's assets to Freedom")]. Additionally, Weaver-Bey signed the Closing Documents [Weaver-Bey Dep. 35:14-17] with the advice of counsel, who represented that Hartcom's execution of the Contribution Agreement would not "[v]iolate or conflict or constitute a default under or with any agreements between the stockholders and the Company [Hartcom] or among stockholders related to the Company." [Doc. #122 Ex. A at tab 25, p. 3](memo

from Kee Borges and Silvestri, counsel to Hartcom).

On this record the Court finds that the Closing Documents signed by Brisker and Weaver-Bey represent the full extent of the agreements between Hartcom and Freedom. Weaver-Bey's affidavit characterizing his prior conversations with Brisker as an "agreement" does not constitute "concrete evidence from which a reasonable juror could return a verdict in [non-movant's] favor." Page v. Connecticut Department of Public Safety, 185 F. Supp. 2d 149, 152 (D. Conn. 2002). There is no dispute that the Closing Documents do not reference any assumption of Hartcom's liabilities. Findings of Fact ¶¶ 11-14,16.

B.    Olevni's Status Under the Controlling Agreement

      1.    Express Provisions

It is undisputed that the Closing Documents expressly deny the assumption of Hartcom's obligations by Freedom, including the Olevni Loan. Id.

The Closing Documents also expressly deny the creation of any third-party beneficiaries, as Olevni claims to be. Findings of Fact ¶ 17. In Connecticut,

> the ultimate test to be applied in
> determining whether a person has a right of
> action as a third party beneficiary is
> whether the intent of the parties to the
> contract was that the promisor should assume
> a direct obligation to the third party
> beneficiary and . . . that intent is to be
> determined from the terms of the contract
> read in the light of the circumstances
> attending its making, including the motives
> and purposes of the parties . . . .

<u>Gazo v. City of Stamford</u>, 255 Conn. 245, 261 (2001)(citations

omitted; brackets omitted). Both the Weaver-Bey and Neigher

affidavits set forth that at least two parties, Freedom and

Hartcom, indicated motive, purpose, and intent to create third-

party beneficiary rights in Olevni. [Doc. #130 Ex. B. ¶¶ 9-11,

Ex. C. ¶¶ 9-10]. However, there is no evidence that Fleet, a

party in privity to the Closing Documents, had any knowledge or

intent to make Olevni a third-party beneficiary. "[T]he only way

a contract could create a direct obligation between a promisor

and a third party beneficiary would have to be, under our rule,

because the parties to the contract so intended." <u>Gazo</u>, 255 Conn.

at 261 (internal citation omitted). Given the express denial of

any third-party rights in the Closing Documents and the lack of

any evidence that Fleet knew of Olevni, the Court finds that

Olevni was not a third party to that contract.

Even assuming arguendo that the Brisker/Weaver-Bey

discussion was a contract (it was not) creating third-party

rights in Olevni, the parties to that alleged contract could

"discharge or alter the promisor's obligations" as long as the

terms did not prohibit it, there was no reliance upon it, and the

third party had not yet brought suit. <u>See</u> <u>The Detroit Institute</u>

<u>of Arts Founders Society v. Rose</u>, 127 F. Supp. 2d 117, 130

(2001)(citing Restatement (Second) of Contracts § 311). Olevni

has provided no evidence of terms, reliance, or a suit that

occurred in the three days between March 28, 2004, when Weaver-

Bey assumed the Hartcom obligations, and March 31, 2004, when the

19

Closing Documents were transacted. The only reliance in evidence is that the Hartcom shareholders, who were also the members of Olevni, transferred their shares to Weaver-Bey in exchange for his assumption of the Olevni Loan. <u>See</u> Findings of Fact ¶¶ 7-8; Neigher Aff. ¶¶ 9-10. There was no reliance by Olevni that could invalidate the Closing Documents, and Olevni has no claim to third-party rights.

2. <u>Parol Evidence Rule</u>

The merger clause contained in the Closing Documents lends further support to the express provisions and militates against reading the Olevni Loan obligation into that contract. <u>See</u> Findings of Fact ¶ 15. The parol evidence rule bars consideration of extrinsic evidence of an agreement where a written agreement on the same subject matter is unambiguous and fully integrated. <u>Schilberg</u>, 263 Conn. at 277-278; <u>see also</u> <u>Alstom Power, Inc. v. Balcke-Durr, Inc.</u>, 269 Conn. 599, 609 (2004). "After this, to permit oral testimony, or prior contemporaneous conversations, or circumstances, or usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." <u>Schilberg</u>, 263 Conn. at 277.

Parol evidence is admissible, however, to show mistake or fraud. <u>Id.</u> Olevni alleges fraud in its opposition to the motion for summary judgment, arguing that Brisker defrauded Fleet by not disclosing Freedom's alleged intention to pay the Olevni Loan obligation, and/or that Brisker defrauded Weaver-Bey by substituting terms different from those discussed prior to the

Closing. [Doc. #129 at 18-22]. Weaver-Bey asserts in his affidavit that he thought that the Closing Documents he signed would oblige Freedom to assume the Olevni Loan, and that he was surprised to learn that they did not. [Weaver-Bey Aff. ¶ 12]. Olevni also submits that Brisker signed monthly payments on the Olevni Loan from April 14, 2004 until March 24, 2006[12] [doc. #130 at ¶ 44], which reinforces Weaver-Bey's assertions. However, it is noteworthy that while Olevni concludes that this is evidence of fraud [doc. #129 at 18-22], Weaver-Bey never directly accuses anyone of fraudulently omitting this intention [see Weaver-Bey Aff. ¶ 12].

To the extent that Weaver-Bey contends he did not read the Closing Documents, "[t]he general rule is that where a person of mature years, and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so . . . ." Ursini v. Goldman, 118 Conn. 554 (1934); see also Phoenix Leasing, Inc. v. Kosinski, 47 Conn. App. 650, 654 (Conn. App. 1998). This rule is qualified by the intervention of fraud or artifice, or mistake not due to negligence. Id. Here the Court does not merely rely upon Weaver-Bey's reputation as a "civic leader" in Connecticut,

---

[12]Freedom argues that evidence of subsequent conduct is barred by the parol evidence rule where the terms of a contract are unambiguous. See e.g. Cahill v. Cahill, No. FA00044002S, 2006 WL 1530118, at *3 (Conn. Super. May, 22, 2006). However, as noted above, parol evidence is admissible to show fraud. Schilberg, 263 Conn. at 277.

see supra note 4, to find that he was fully responsible for the documents that he signed. The Court also notes that Hartcom's counsel vetted the documents for inconsistencies and warranted that the Closing Documents would not "[v]iolate or conflict or constitute a default under or with any agreements between the stockholders and the Company [Hartcom] or among stockholders related to the Company." [Doc. #122 Ex. at tab 25, p. 3](memo from Kee Borges and Silvestri, counsel to Hartcom). Weaver-Bey's passive suggestion of fraud in his affidavit is not sufficient concrete evidence to raise a genuine issue of material fact for Olevni's claim. See Securities & Exchange Comm'n, 585 F.2d at 33; Lujan, 497 U.S. at 888; Page, 185 F. Supp. 2d at 152.

Nor would an allegation of mistake be availing to read the Olevni Loan obligation into the Closing Documents. "[W]here a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of mistake." Wallenta v. Moscowitz, 81 Conn. App. 213, 222-223 (Conn. App. 2004)(quoting Holly Hill Holdings v. Lowman, 226 Conn. 748, 757, (1993), citing 1 Restatement (Second), Contracts §154). Second, even if mistake were proved, the remedy is rescission or reformation; however, "a contract should not be reformed if doing so would affect the rights of an innocent third party . . . who relied on the previous contract and lacked notice of the mistake." Wesley v. Schaller Subaru, Inc., 277 Conn. 526, 542 n.15 (2006). Here, the contract cannot be reformed because of

Fleet's reliance.

Moreover, even assuming there were sufficient evidence of fraud or mistake on Freedom's part to raise a genuine issue of fact as to Freedom's intentions, it would not be material to Olevni's claim. As the Court found above, the alleged prior oral understanding between Brisker and Weaver-Bey did not constitute a binding agreement, and Olevni was not party to the Closing Documents. Therefore Olevni has no standing to bring a breach of contract claim against Freedom.

Unjust Enrichment

Finally, count two of Olevni's complaint alleged unjust enrichment as an alternative cause of action in case Olevni failed to prove its breach of contract claim. But where a contract governs, there can be no claim for unjust enrichment on the same subject matter. See Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 570 n.12 (2006) ("proof of an operative contract would have been incompatible with recovery on unjust enrichment"); see also Meaney v. Connecticut Hospital Assn., Inc., 250 Conn. 500, 517 (1999) ("express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter")(citation omitted). Here the Closing Documents govern the conveyance of the WKND asset from Hartcom to Freedom, so it is presumptively impossible to say that Freedom was unjustly enriched by the conveyance.

Accordingly, counterclaim-defendant's Motion for Summary Judgment is **GRANTED.**

CONCLUSION

For the reasons stated, counterclaim-defendant's Motion for Summary Judgement [**Doc. #119]** is **GRANTED.**[13]

ENTERED at Bridgeport this 25th day of August 2008.


__/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

_____

[13]This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #104] on July 12, 2007, with appeal to the Court of Appeals.